FILED
IN CLERKS OFFICE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

2022 AUG 29 PM 3: 08

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF GEORGIA; STATE OF FLORIDA; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF LOUISIANA; STATE OF MICHIGAN; STATE OF MASSACHUSETTS; and STATE OF NEW YORK *ex rel.* OMNI HEALTHCARE, INC,

Plaintiffs,

v.

EXAGEN, INC. and JOHN DOES 1-10,

Defendants.

**Filed *In Camera* and Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

DO NOT PLACE ON PACER

---

*QUI TAM* COMPLAINT

---

## I. INTRODUCTION

1. Relator brings this action for violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("False Claims Act" or "FCA"), the Anti-Kickback Statute ("AKS") and the Eliminating Kickbacks and Recovery Act ("EKRA") in order to recover damages and civil penalties on behalf of the United States and the above-named Plaintiff States arising from false and/or fraudulent statements, records and claims made by Defendants. The allegations involve a clinical laboratory testing scheme carried out by Defendants Exagen, Inc. ("Exagen") and John Does. Relator asserts Exagen is providing illegal financial inducements to physicians in exchange for patient referrals for laboratory testing. Exagen's financial relationships with referring physicians violate federal and state anti-kickback statutes which prohibit physician self-

referrals. Exagen is a nationwide provider of clinical laboratory testing services. Many of the patients receiving their services are beneficiaries of Medicare, Medicaid and TRICARE ("Government Payors"). Additionally, a significant number of patients receiving its services are insured privately, including patients of California and Illinois.

2. Exagen's fraudulent scheme is wide-reaching but straightforward. Exagen offers cash renumeration to physicians and others in order to induce them to refer patients for laboratory testing related to various health issues. Exagen offers diagnostic tests, which have catchy names such as "AVISE Prognostic" (AVISE Monitor) for lupus, fibromyalgia and antihospholipid syndrome ("APS"), prognostic tests for thrombosis and rheumatoid arthritis and monitoring tests for hydroxchloquine in whole blood and advanced blood testing for patients with Systemic Lupus Erythematossus ("SLE"). Exagen offers physicians and others $20.00 per patient referral, which was increased from $10.00 per patient referral in or around 2020. Exagen's prospectus, which was filed with the Securities and Exchange Commission ("SEC") prior to it becoming a public company, is dated September 18, 2019 and identifies the following as a potential risk:

> *On June 25, 2014, the Office of Inspector General of the Department of Health and Human Services, or the OIG, released a Special Fraud Alert, expressing concern regarding laboratory payments made to referring physicians and physician group practices for blood specimen collection, processing, and packaging. Specifically, the OIG expressed concern that such arrangements may implicate the Federal Anti-Kickback Statute when laboratories make payments to physicians for services that are already covered and reimbursed by Medicare, or are not commercially reasonable or exceed fair market value, all in order to induce physicians to order tests from such laboratory. Because the choice of laboratory and the decision to order laboratory tests is made or strongly influenced by the physician, with little or no input from patients, such payment may induce physicians to order more laboratory tests than are medically necessary, particularly when the payments are tied to, or take into account, the volume or value of business generated by the physician. We had entered into certain arrangements with physicians for services related to specimen collection,*

> *transporting and handling. Effective August 2015, we terminated all such agreements.*

3. Exagen, although making claims to the contrary in its prospectus prior to becoming a public company, has continued the practice of paying physicians, using the assumption that investigators might believe what is contained in their prospectus. Defendant Exagen has caused Medicare, Medicaid and TRICARE and private insurers to pay for laboratory tests that are, in many instances, not medically necessary by paying fees to physicians who continue to refer patients to them in exchange for these inducements. One purpose of the inducements offered by Defendant Exagen is to obtain referrals from target physicians and physician groups. All claims submitted to Government healthcare programs or to private insurers in California and Illinois by Exagen that are tainted by this fraudulent kickback scheme are by their very nature false claims.

4. As explained in greater detail herein, Defendants engaged in the above-mentioned practices, which purposefully led to the submission of claims which violated the FCA.

5. The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty of 5,500 to $11,000 for each such claim submitted on or before November 2, 2015 and $10,781 to $21,563 for each such claim submitted after November 2, 2015, as well as three times the amount of the damages sustained by the Government. The FCA permits persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal, without service on the defendants. The complaint remains under seal while the Government conducts an investigation of the complaint's allegations and determines whether to join the action.

6. Pursuant to the FCA and the FCAs for the States of California, Colorado, Connecticut, Georgia, Florida, Illinois, Indiana, Louisiana, Michigan, Massachusetts, and New York, Relator seeks to recover on behalf of the United States and the above-named Plaintiff States damages and civil penalties arising from Defendants' purposeful submission of false and/or fraudulent claims to the Government.

## PARTIES

7. The United States and the Plaintiff States are real parties of interest in this action.

8. Relator Omni Healthcare, Inc. is a multi-specialty physician group based in Brevard County, Florida. Relator operates in central Florida and specializes in the fields of internal medicine, surgery, pediatrics, family practice and many medical and surgical sub-specialties. The facts alleged within are based on the personal observation of Relator Omni's principal and other OMNI employees, as well as documents and information in their possession. The information and observations led Relator to question Defendant's fraudulent actions.

9. Defendant Exagen, Inc., formerly known as Exagen Diagnostics, Inc., is a Delaware corporation with its principal offices in Vista, California. It develops and sells testing products under the AVISE brand name. The testing products focus on patients with "debilitating and chronic autoimmune diseases" and are marketed primarily to rheumatologists.

10. Defendants John Does are entities and individuals who knowingly received kickbacks from Defendant Exagen.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

12. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in the District of Massachusetts.

13. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all Defendant can be found in, reside in and/or have transacted business in the District of Massachusetts.

14. Relator knows of no other FCA complaints that have been filed against Defendant alleging the same or similar actions for the time period at issue. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). Relator made voluntary disclosures to the United States prior to the filing of this lawsuit.

## REGULATORY OVERVIEW

### The Federal and State False Claims Acts

15. The Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

31 .S.C. § 3729(a)(1).

16. The FCA defines "knowing" and "knowingly" to mean that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or

falsity of the information. 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is not a defense to an action under this act. *Id.*

17. In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation.

18. The Plaintiff State FCAs are modeled after the Federal FCA, and contain provisions similar to the ones quoted above. Relator asserts claims under the California, Colorado, Connecticut, Georgia, Florida, Illinois, Indiana, Louisiana, Michigan, Massachusetts, and New York FCAs for the false claims alleged in this Complaint.

**Cost Reporting and Claims Processing Procedures Under the Medicare Program**

19. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

20. Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

21. CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

22. There are two primary components to the Medicare Program, Part A and Part B.

Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve Medicare Part B only for services billed by the Defendant to Medicare.

23. In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

24. To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

25. That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**<u>Conditions of Participation and Conditions of Payment</u>**

26. To participate in the Medicare Program, a health care provider must also file a

provider agreement with the Secretary of HHS. 42 U.S.C. §1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

**Obligation to Refund Overpayments**

27. As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

28. Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

**Other Federally-Funded Health Care Programs**

29. Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action were beneficiaries of one of three federally-funded health care benefit programs – Medicare, Medicaid, or TRICARE. Accordingly, those other two programs are briefly discussed as well.

30. The Medicaid Program, as enacted under Title XIX of the Social Security Act of

1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level while the individual states administer the program on the state level. Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

31. TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq.*). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

**The Federal Anti-Kickback Statute**

32. Enacted in 1972, the federal Anti-Kickback Statute, 42 U.S.C. § 13207b(b),

protects patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions. When a company pays kickbacks to a doctor in order to induce him/her to use the company's products or services, it fundamentally compromises the integrity of the doctor-patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon physicians to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by such healthcare programs.

33. The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person: (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2).

34. A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

35. The term "remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. 42 U.S.C. § 1320a-7b(b)(1).

36. The Anti-Kickback Statute has been interpreted by the majority of federal courts to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.

37. The United States Department of Health & Human Services (HHS) has published "safe harbor" regulations that define practices not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse. 42 C.F.R. § 1001.952. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor. As further explained herein, none of the practices as issue in this matter meet these safe harbor regulations.

38. Compliance with the Anti-Kickback Statute is a condition of payment under Government healthcare programs, including the Medicare and Medicaid programs, and that condition applies regardless of whether the kickback payor or recipient is submitting the claim to the Government. Claims that arise from a kickback scheme are per se false, and violate the False Claims Act, because they are the result of a kickback – no further express or implied false statement is required to render such infected or tainted claims false, and none can wash the claim clean.

39. On March 23, 2010, as part of the Patient Protection and Affordable Care Act, PL 111-148 ("PPACA"), the Anti-Kickback Statute was amended to explicitly provide that a claim resulting from a violation of the Anti-Kickback Statute is a violation of the federal False Claims Act. Specifically, the federal AKS was amended by adding subsection (g) to 42 U.S.C. § 1320a–7b. 42 U.S.C. 1320a–7b(g), which states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code."

40. In addition, Section 6402(a) of the PPACA established section 1128J(d) in the

Social Security Act regarding reporting and returning Medicare and Medicaid overpayments. Section 1128J(a) requires a person who has received an overpayment to report and return the overpayment by the later of (i) 60 days after the overpayment was identified or (ii) the date any corresponding cost report is due. The knowing and improper failure to return an overpayment subjects the recipient to liability under the federal False Claims Act, 31 U.S.C. § 3730(a)(1)(G).

**Eliminating Kickbacks and Recovery Act**

41. The Eliminating Kickbacks and Recovery Act ("EKRA") was enacted by Congress in 2018. 18 U.S.C. § 220. It targets patient brokers who seek to profit from illegal patient referrals by prohibiting laboratories, clinics, recovery centers and other treatment facilities from accepting or paying kickbacks from such referrals. EKRA makes it a federal crime for anyone to knowingly and willfully:

a. Solicit or receive any remuneration, overtly or covertly, in cash or in kind, in return for referring a patient or patronage to a recovery home, clinical treatment facility, or laboratory; or
b. Pay or offer any remuneration, overtly or covertly, in case or in kind
    i. To induce a referral of an individual to a recovery home, clinical treatment facility, or laboratory; or
    ii. In exchange for an individual using the services of that recovery home, clinical treatment facility, or laboratory.

**ALLEGATIONS**

42. In late 2014, Relator entered into a Specimen Processing Agreement (SPA) with Defendant Exagen, Inc., who was operating under the name of Exagen Diagnostics, Inc. at the time. The Sales and Purchase Agreement ("SPA") was signed by Mark Bobango, Chief Financial

Officer for Relator, on August 22, 2014, and by Douglas Jenks, Director, Revenue Assurance and Billing, Exagen Diagnostics, Inc., on September 22, 2014. The SPA called for a "referral fee", disguised as a specimen collection fee, of $10.00 for each specimen the Relator sent to the Defendant. From the time of the signing of the SPA through April 6, 2016 there were approximately 129 specimens submitted to Defendant who paid the Relator $1,290.00 for those specimens.

43. From April 6, 2016 through 2019, Relator did not submit any specimens to Defendant for the "referral fee". In late 2019, Relator reached out to Defendant Exagen in order to determine if the company was still paying "referral fees" for specimen collections. Relator is very experienced in, and knowledgeable of, the False Claims Act and knew that if Defendant was still paying "referral fees," even though they claimed in their prospectus that the practice had ceased, they were violating the AKS. On October 7, 2019, Kristin Foster, Provider Relations Supervisor for Defendant Exagen, responded to Mark Bobango stating that the company had not received any invoices since 2016 and provided an updated SPA for Relator to sign and return. Based on this email, Relator began submitting specimens to Defendant in order to gather evidence that Defendant was knowingly violating the AKS. The following invoices were submitted to Defendant for collection of specimens:

| Date of Invoice | # of Specimens Submitted | Amount of Invoice |
|---|---|---|
| October 9, 2019 | 180 | $1,800.00 |
| November 6, 2019 | 28 | $ 280.00 |
| December 17, 2019 | 20 | $ 200.00 |
| January 3, 2020 | 26 | $ 260.00 |
| February 3, 2020 | 37 | $ 370.00 |
| March 6, 2020 | 36 | $ 360.00 |
| June 12, 2020 | 32 | $ 320.00 |

| **Total Amount Invoiced** | $3,590.00 |
|---|---|

44. In response to the invoices submitted by Relator, Defendant Exagen paid the invoices submitted by Relator for the collection of specimens on the following dates a sampling of which is provided:

| **Date of Check from Defendant** | **Amount of Payment to Relator** |
|---|---|
| January 17, 2020 | $ 200.00 |
| January 30, 2020 | $ 260.00 |
| February 13, 2020 | $ 370.00 |
| March 24, 2020 | $ 360.00 |

45. Once Defendant Exagen thought Relator was willing to go along with their scheme, communication with the principal, Dr. Craig Deligdish, became frequent. After several telephone conversations with Dr. Deligdish, Bonnie Weber, Defendant's Senior Market Development Manager for the State of Florida, sent an email on June 4, 2020 directly to him.

46. Defendant was so interested in getting more of the "referral" specimen business from Relator that Weber planned to stop by the principal's office the following week. After several discussions with Bonnie Weber, Michael Grieshaber, Senior National Director of Managed Markets for Defendant, took over communication with Relator to "close the deal" and put in a more lucrative SPA with an even higher payment of $20.00 per specimen collected and submitted to Defendant.

47. As of this date Relator continues to provide specimens under the revised SPA in order to collect evidence of this ongoing AKS scheme being perpetrated by Defendant Exagen and Defendant Does.

## DAMAGES

48. A review of Exagen's Annual Report filed on March 25,2020 with the Securities

and Exchange Commission (SEC) shows annual revenue in 2017 of $26,807,000.00, in 2018 of $32,440,000.00 and in 2019 of $40,387,000.00 for a three-year total of $99,634,000.00. The Annual Report also shows that Medicare and other government programs accounted for 30% of revenue in 2018 and, presumably, in 2017, and 25% of revenue in 2019. Based on Defendant's own publicly available filed documents, Medicare accounted for approximately $27,870,850.00 in revenue during the period of 2017-2019. Based on Relator's own experience with Defendant it can be assumed that most, if not all, medical providers collecting specimens for Defendant under a Specimen Processing Agreement are receiving illegal payments that violate the AKS and EKRA, which could conceivably taint most, if not all, of the $27,870,850.00 paid by Medicare to Defendant.

## COUNT I

### VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729 et seq.

49. Relator incorporates paragraphs 1 through 48 of this Complaint as through fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

50. As described in greater detail above, Defendants abused Government healthcare programs in connection with improper billing related to providing illegal financial inducements to physicians in exchange for referrals of patients for laboratory testing, as well as for engaging in testing that is medically unnecessary.

51. Under the FCA, Defendants have violated:

i. 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

52. Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## COUNT II

### VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT, CALIFORNIA GOVERNMENT CODE §§ 12651, et seq.

53. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein, including but not limited to evidence that shows Defendants violated California Business and Professions Code §650, California Welfare and Institutions Code §14107.2, and the California Code of Regulations Title 22 §51501(a).

54. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 12651(a)(1) of the Act. Such claims caused actual damages to the State.

55. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 12651(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT III

### VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT FOR PUBLIC ASSISTANCE PROGRAMS CONN. GEN. STAT. § 17b-301 et seq.

56. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

57. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 17b-301b(1) of the Act. Such claims caused actual damages to the State.

58. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 17b-301b(2) of the Act. Such claims caused actual damages to the State.

## COUNT IV

### VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT FLA. STAT. §§ 68.082(2) et seq.

59. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

60. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 68.082(2)(a) of the Act. Such claims caused actual damages to the State.

61. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 68.082(2)(a) of the Act. Such claims caused actual damages to the State.

## COUNT V

## VIOLATIONS OF THE GEORGIA FALSE MEDICAID CLAIMS ACT
## GA. CODE ANN. §49-4-168.1 et seq.

62. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

63. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 49-4-168.1(a)(1) of the Act. Such claims caused actual damages to the State.

64. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 49-4-168.1(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT VI

## VIOLATIONS OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
## 740 ILL. COMP. STAT. ANN. §§ 175/3 et seq.

65. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

66. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 175/3(a)(1) of the Act. Such claims caused actual damages to the State.

67. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 175/3(a)(2) of the Act. Such claims caused actual damages to the State.

## COUNT VII

## VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT INDIANA CODE 5-11-5.5-2 et seq.

68. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

69. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5-11-5.5-2(b)(2), of the Act. Such claims caused actual damages to the State.

70. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5-11-5.5-2(b)(8), of the Act. Such claims caused actual damages to the State.

## COUNT VIII

## VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW LA. REV. STAT. § 46:438.3 et seq.

71. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

72. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(A) of the Act. Such claims caused actual damages to the State.

73. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 46:438.3(B) of the Act. Such claims caused actual damages to the State.

## COUNT IX

### VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS ACT
### MASS. ANN. LAWS. CH. 12, §§ 5B et seq.

74. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

75. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 5B(1), of the Act. Such claims caused actual damages to the State.

76. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 5B(2), of the Act. Such claims caused actual damages to the State.

## COUNT X

### VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### MCLS §§ 400.607 et seq.

77. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

78. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 400.607(1), of the Act. Such claims caused actual damages to the State.

79. Through these acts, the Defendants knowingly made, used, or caused to be made

or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 400.607(3), of the Act. Such claims caused actual damages to the State.

## COUNT XI

### VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT NY CLS ST. FIN. § 189 et seq.

80. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

81. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section 189(1)(a), of the Act. Such claims caused actual damages to the State.

82. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation of Section 189(1)(b), of the Act. Such claims caused actual damages to the State.

## COUNT XII

### VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT Colorado Stat. §§25.5-4-304 - 25.5-4-310

83. Relator re-alleges and incorporates by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

84. Through these acts, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the State in violation of Section §§25.5-4-304 - 25.5-4-310 of the Act. Such claims caused actual damages to the State.

85. Through these acts, the Defendants knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim to the State, in violation

of Section §§25.5-4-304 - 25.5-4-310 of the Act. Such claims caused actual damages to the State.

**PRAYER**

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a. This Court enter an order determining that Defendants violated the FCA and State FCAs by making false statements and records to cause false claims to be submitted to the United States and the Plaintiff States;

b. This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c. This Court enter an order requiring Defendants to cease and desist from violating the FCA and State FCAs;

d. This Court enter an order requiring Defendants to pay all expenses, attorney's fees and costs associated with this action;

e. This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f. Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Dated: August 2, 2022

Respectfully submitted,

*/s/ Jonathan Fitch*
Jonathan W. Fitch
Massachusetts Bar No.:
jwf@fitchlp.com
Fitch Law Partners LLP
84 State Street
Boston, Massachusetts 02109
Tel.: (617) 542-5542
Fax: (617) 542-1542

**Local Counsel for Relator**

Jesse Hoyer Estes
Florida Bar No.: 076934
jesse@hoyerlawgroup.com
Sean Estes
Florida Bar No.: 048320
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710

**Lead Counsel for Relator**